UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CROWN CORK & SEAL COMPANY, INC. MASTER RETIREMENT TRUST, *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>CREDIT SUISSE FIRST BOSTON CORP., *et al.*,<br>　　　　　　Defendants. | Case No. 12-cv-05803-JLG<br>Judge James L. Graham[*] |
| STATE OF ARIZONA, *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>CREDIT SUISSE FIRST BOSTON CORP., *et al.*,<br>　　　　　　Defendants. | Case No. 12-cv-05804-JLG<br>Judge James L. Graham |
| CITY OF CHANDLER, *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>BANK ONE, N.A., *et al.*,<br>　　　　　　Defendants. | Case No. 12-cv-05805-JLG<br>Judge James L. Graham |
| LLOYDS TSB BANK PLC,<br>　　　　　　Plaintiff,<br>　　v.<br>BANK ONE, N.A, *et al.*,<br>　　　　　　Defendants. | Case No. 12-cv-07263-JLG<br>Judge James L. Graham |
| METROPOLITAN LIFE INSURANCE COMPANY, *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>BANK ONE, N.A., *et al.*,<br>　　　　　　Defendants. | Case No. 12-cv-07264-JLG<br>Judge James L. Graham |

Opinion and Order

　　This matter is before the court on four separate motions to exclude expert testimony and reports at trial. Defendant Credit Suisse has moved to exclude the testimony and report of Bernard S. Black, who was designated by the Arizona Noteholder plaintiffs as an expert on issues relating to the responsibilities and standard of care of a placement agent in securities transactions. Credit Suisse has also moved to exclude the testimony and report of John C. Coffee, Jr., who was

---

[*] The Honorable James L. Graham, United States Senior District Judge for the Southern District of Ohio, presiding pursuant to intercircuit assignment to the Southern District of New York.

designated by plaintiffs MetLife and Lloyds as an expert on those same issues, as well as the issues of causation and damages.

MetLife and Lloyds have moved to exclude the testimony and report of two individuals designated as experts by Credit Suisse. The first is Myron S. Glucksman, who was designated as an expert on issues relating to the responsibilities and standard of care of a placement agent in securities transactions. The second is Allan W. Kleidon, who was designated as an expert on causation and damages.

For the reasons set forth below, the court will exclude the reports of the experts but will permit each of the experts to testify at trial. The reports are hearsay and, as detailed below, each of the reports are further excluded on the grounds that they contain inadmissible statements, such as legal conclusions and opinion as to certain parties' knowledge, state of mind, and intent.

The experts will be allowed to testify at trial because the court finds that each proffered expert is qualified and has knowledge that will assist the jury as they consider the many complex issues they must decide in this case. Because each expert exhibited a tendency in his report to opine as to ultimate issues in this case, the court cautions the parties to ensure that the testimony of their experts does not exceed the bounds of proper expert opinion. In preparing experts to testify at trial, counsel should give due consideration to the formulation of hypothetical questions when seeking to elicit opinion on issues such as the proper standard of care of a reasonable placement agent. Assumptions made in the hypothetical questions must have some basis in the factual record. Further, expert opinion must be based on knowledge of, or experience with, relevant industry customs, practices, and standards.

With those guidelines stated, the court now turns to the motions to exclude.

### I.     Applicable Standards

Federal Rule of Evidence 702 permits testimony by an expert witness when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the "testimony is based on sufficient facts or data;" (3) the "testimony is the product of reliable principles and methods;" and (4) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

Though "Rule 702 embodies a liberal standard of admissibility for expert opinions," the district court serves an important "gatekeeping" role. Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). Where a designated expert's qualifications are challenged, the district court must ensure that "the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F.Supp.2d 346, 352 (S.D.N.Y. 2003). Further, the district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The inquiry into reliability and relevance is a "flexible one," id. at 594, "with the ultimate goal of assuring that proffered expert testimony is scientifically acceptable and relevant, as well as otherwise reliable from an evidentiary standpoint." In re Zyprexa Prods. Liab. Litig., 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007). "The party who presents an expert bears the burden of proving each element necessary to the admissibility of that expert's testimony and report." Id.

### A. Qualifications

A witness may be qualified as an expert if he or she possesses specialized knowledge, skill, experience, training, or education. Fed. R. Evid. 702. Because experts are granted more latitude than lay witnesses to testify about their opinions, see Fed. R. Evid. 705, challenges to a proffered expert's qualifications must be resolved as a "threshold question." Nimely, 414 F.3d at 396 n. 11. "Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." Cary Oil Co., Inc. v. MG Refining & Marketing, Inc., No. 99 Civ. 1725, 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting TC Sys. Inc. v. Town of Colonie, New York, 213 F.Supp.2d 171, 174 (N.D.N.Y. 2002)); see also Zyprexa Prods., 489 F.Supp.2d at 282 ("In keeping with the 'liberal thrust' of the Federal Rules . . . the standard for qualifying expert witnesses is liberal.") (internal citation omitted).

To determine whether a witness qualifies as an expert, the court "must first ascertain whether the proffered expert has the educational background or training in a relevant field." TC Sys., 213 F.Supp.2d at 174; see also Arista Records LLC v. Usenet. com, Inc., 608 F.Supp.2d 409, 422 (S.D.N.Y. 2009). Any one of the qualities listed in Rule 702 – knowledge, skill, experience, training, or education – may be sufficient to qualify a witness as an expert. See Tiffany (NJ) Inc. v. eBay, Inc., 576 F.Supp.2d 457, 458 (S.D.N.Y. 2007) (citing 4 Jack B. Weinstein, Weinstein's Federal Evidence § 702.04[1][c] (2d ed. 2006)).

A court then must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). The expert's testimony must be related to those issues

or subjects within his or her area of expertise.  See Malletier v. Dooney & Bourke, Inc., 525 F.Supp.2d 558, 642 (S.D.N.Y. 2007).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." Zyprexa Prods., 489 F.Supp.2d at 282 (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 80 (2d Cir. 1997)).  Thus, an expert "should not be required to satisfy an overly narrow test of his own qualifications," and the court's focus should be on "whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citation and internal quotation marks omitted).  Arguments that a proffered expert "lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'" Zyprexa Prods., 489 F.Supp.2d at 282 (quoting McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995)).

  **B.** **Reliability**

  An expert's opinion must have a "reliable basis in the knowledge and experience of his discipline."  Daubert, 509 U.S. at 590.  Factors a court may consider will depend on the circumstances of the case, including whether the proffered expert's testimony is scientific in nature. See id. at 593-94 (enumerating factors for scientific opinion, including whether the theory or technique has been tested and subjected to peer review and publication).  The district court has discretion in evaluating the reliability of an expert's methods and may determine the appropriate criteria for evaluating reliability.  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150-52 (1999).

  "As the Second Circuit has noted, district courts should presume expert evidence is reliable." UMG Recordings, Inc. v. Lindor, 531 F.Supp.2d 453, 456 (E.D.N.Y. 2007) (citing Borawick v. Shay, 68 F .3d 597, 610 (2d Cir. 1995)).  In evaluating the reliability of an expert's proposed testimony, a court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.  A "sufficiently rigorous analytical connection" must exist "between an expert's methodology and his conclusions." Nimely, 414 F.3d at 396.  Opinion that "is connected to existing data only by the *ipse dixit* of the expert" need not be admitted. General Elec., 522 U.S. at 146.  Similarly, opinion based on unfounded extrapolation, insufficient facts or data, or unsupported suppositions should be rejected.  See United States v. Tin Yat Chin, 371 F.3d 31, 40-41 (2d Cir. 2004); Zyprexa Prods., 489 F.Supp.2d at 284.  A court thus must "make certain that an

4

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho, 526 U.S. at 152; see also Zyprexa Prods., 489 F.Supp.2d at 284-85 ("Sound scientific methodology requires a scholar to make some effort to account for alternative explanations for the effect whose cause is at issue.").

Once the trial court has found the expert's method to be reliable, it is left to the jury to decide what weight to give the expert's opinion.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.  It is the function of the factfinder to weigh conclusions that seem unlikely or are contrary to those of another expert.  See Fed. R. Evid. 702 advisory committee note (2000) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."); Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony.") (internal quotation marks omitted); Zyprexa Prods., 489 F.Supp.2d at 285 ("Any more rigorous approach would deny the jury's constitutional role.").

C. **Relevance and Helpfulness**

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  To that end, the court must determine whether proffered expert testimony would assist the trier of fact in deciding the issues before it.  This requires a valid connection between the expert's testimony and the issues to be determined by the jury.  Daubert, 509 U.S. at 591-92; see also Zyprexa Prods., 489 F.Supp.2d at 283 ("Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case – even if it simply explains facts and evidence already in the record.").

A court should not admit expert testimony that "undertakes to tell the jury what result to reach ... [or] attempts to substitute the expert's judgment for the jury's."  United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994).  Likewise, a court should not admit expert testimony "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help."  United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991).  Finally, because "expert evidence can be both powerful and quite misleading," the court "exercises more control over experts than over

lay witnesses" in weighing potential prejudice against probative value under Rule 403.  Daubert, 509 U.S. at 595; see also Nimely, 414 F.3d at 397.

II.     Discussion

    A.     **Professor Black**

        1.     **Qualifications**

The Arizona Noteholders have designated Professor Bernard S. Black as an expert to testify on the standard of care and the due diligence and disclosure responsibilities of a placement agent in securities transactions.  At the time plaintiffs designated him as an expert, Professor Black was a Professor of Law at the University of Texas School of Law, a Professor of Finance at the McCombs School of Business at the University of Texas, and Co-Director of the Center for Law, Business, and Economics at the University of Texas.  Among the courses he taught at Texas were corporate finance, corporations, corporate acquisitions, and law and economics.

The court takes notice that Professor Black has since become a Professor of Law at the Northwestern University School of Law and a Professor of Finance at the Kellogg School of Management at Northwestern University.  Prior to his time at the University of Texas, Professor Black was a Professor of Law at Stanford Law School, of which he is a graduate, and a Professor of Law at Columbia Law School.  He has also served as a Senior Policy Advisor for the Harvard Institute for International Development, served as Counsel to SEC Commissioner Joseph Grundfest, and practiced law at Skadden, Arps, Slate, Meagher & Flom in New York.  Professor Black has authored numerous books and articles on topics relating to finance and corporate law.  In 2008, Professor Black served as a court-appointed, independent expert in In re Visa Check/Mastermoney Antitrust Litigation, 96-cv-5238 (E.D.N.Y.), to advise the court on a proposal to securitize funds obtained in that action through settlement.

Credit Suisse's challenge to Professor Black is that he has no real world experience as an investment banker in the specific type of transactions that took place here – Rule 144A placements of non-mortgage, asset-backed securities.  See 17 C.F.R. § 230.144A (providing a safe harbor from normal registration requirements (15 U.S.C. § 77e) for private resales of restricted securities to a qualified institutional buyer).  According to Credit Suisse, that Black lacks first-hand familiarity with Rule 144A placements makes him unqualified to offer opinions on how a reasonable placement agent in such a transaction should perform its duties.

The court rejects Credit Suisse's challenge to Professor Black's qualifications. Simply put, knowledge and expertise need not necessarily be gained by on-the-job experience. See Tiffany, 576 F.Supp.2d at 458; Wechsler v. Hunt Health Sys., Ltd., 381 F.Supp.2d 135, 143 (S.D.N.Y. 2003) (holding that Rule 702 does not require insistence on specific backgrounds or narrow qualifications). Credit Suisse cannot deny Professor Black's considerable academic credentials and scholarship in the fields of corporate finance and securities. Moreover, he has testified before federal and state governing bodies, including the Securities and Exchange Commission, on issues relating to corporate governance. And he has advised several foreign governments, including Russia, South Korea, and Indonesia, on matters of corporate governance, securities law, regulation of capital markets, and the fiduciary obligations of directors and firm managers.

The court rejects too the argument that Professor Black is unqualified because he has no specialized expertise in the narrow field Credit Suisse has drawn of "Rule 144A placements of non-mortgage, asset-backed securities." See Zyprexa Prods., 489 F.Supp.2d at 282; see also Jahn v. Equine Services, PSC, 233 F.3d 382, 390 (6th Cir. 2000) (experts not required to "know answers to all the questions a case presents"); Johnson & Johnson, 2006 WL 2128785, at *5 (an expert "should not be required to satisfy an overly narrow test of his own qualifications"). The Arizona Noteholders have demonstrated Professor Black's thorough familiarity with due diligence practices in securities transactions. Credit Suisse has not shown that private placements of asset-backed securities to institutional investors are such a special category that Professor Black's knowledge of due diligence standards will not apply here. See In re Bayou Group, LLC, 396 B.R. 810, 836 (Bankr. S.D.N.Y. 2008) ("There is nothing mystical or esoteric about a hedge fund which distinguishes it from other species of business and financial enterprise."), *aff'd in relevant part*, 439 B.R. 284 (S.D.N.Y. 2010). In sum, the court believes that Professor Black's expertise will readily apply to assist the jury in evaluating Credit Suisse's conduct in placing securities with the Arizona Noteholders. See United States v. Joseph, 542 F.3d 13, 21–22 (2d Cir. 2008) (holding that "quibbles" over an "expert's academic training" go to the weight of the testimony and not its admissibility); Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").

    **2.**    **Reliability**

Professor Black has been designated to testify about the role, standard of care, and due diligence and disclosure responsibilities of a placement agent. In particular, Professor Black will testify about what constitutes a "red flag" of underlying fraud and how a reasonably diligent

placement agent would respond to a red flag, including possibly undertaking further investigation and disclosing the red flag to investors.  See In re WorldCom, Inc. Secs. Litig., 346 F.Supp.2d 628, 672 (S.D.N.Y. 2004) (Red flags refer to "those facts which come to a defendant's attention that would place a reasonable party in defendant's position 'on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'") (quoting In re Sunterra Corp. Sec. Litig., 199 F.Supp.2d 1308, 1333 (M.D. Fl. 2002)).

Credit Suisse argues that Professor Black's methodology is not reliable because he failed to conduct a survey of banking professionals and failed to review available professional literature regarding the topics on which he would testify.  This argument follows from Credit Suisse's contention that Professor Black is not an expert because he lacks investment banking experience. Credit Suisse argues that in order for Professor Black to offer reliable testimony he must survey those in the investment banking profession or the available professional literature.

The court finds that Professor Black has employed sound and reliable methodology.  His report demonstrates that he is familiar with due diligence standards in securities transactions.  He thoroughly reviewed the record in this case, identified evidence of information that may have constituted red flags, analyzed why he believed certain pieces of information were red flags, examined the reasonableness of potential responses to the red flags, and accounted for and compared the responses of Credit Suisse and other investment bankers and actors involved in National Century's operations.  His methodology is characterized by a high level of intellectual rigor and reflects the same approach – that of identifying potential red flags and evaluating possible responses – that courts have found appropriate when examining due diligence in securities transactions.  See, e.g., Stephenson v. PricewaterhouseCoopers, LLP, 768 F.Supp.2d 562 (S.D.N.Y. 2011); WorldCom, 346 F.Supp.2d at 672-78; In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F.Supp.2d 549, 693-704 (S.D. Tex. 2002).  Indeed this is the very same approach employed by Credit Suisse's own expert, Myron Glucksman.

### 3. Relevance and Helpfulness

There is no dispute that expert testimony regarding the standard of care of a reasonably diligent placement agent is relevant and would assist the trier of fact in determining whether Credit Suisse should have known of the National Century fraud and, if so, what information it should have disclosed to investors.  All parties have proffered experts to testify on this matter.

Credit Suisse does, however, raise specific objections to Professor Black's report as exceeding the bounds of proper expert testimony and seeks exclusion of his report from trial.  The

court agrees. As an initial matter, "[c]ourts have held that where an expert is expected to testify at trial, his report is inadmissible hearsay and redundant." Aktas v. JMC Development Co., Inc., No. 1:09–CV–01436, 2013 WL 55827, at *5 (N.D.N.Y. Jan. 3, 2013) (citing Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc., No. 96 CIV 7874, 2002 WL 826956, at *7 (S.D.N.Y. May 1, 2002)); see also Ake v. Gen. Motors Corp., 942 F. Supp. 869, 877-78 (W.D.N.Y. 1996). Moreover, Professor Black's report contains numerous inadmissible statements, including legal conclusions and affirmative assertions about Credit Suisse's subjective intent and knowledge – in essence telling the jury what result to reach on certain elements of plaintiffs' claims.[1] See Highland Capital Mgmt., L.P. v. Schneider, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) (holding that expert may not opine on a party's subjective intent, state of mind, and knowledge); Liberty Media Corp. v. Vivendi Universal, S.A., 874 F.Supp.2d 169, 172 (S.D.N.Y. 2012) (expert may not opine on ultimate legal conclusions).

For these reasons, the court will exclude Professor Black's report from evidence at trial. Nonetheless, the court finds that his testimony will assist the trier of fact and thus he will be allowed to testify, so long as his testimony does not exceed the bounds of proper expert opinion. For instance, if counsel wishes to elicit Professor Black's opinion on how a reasonably diligent placement agent would, in light of industry standard or practice, respond to an alleged potential red flag, the question should be posed in the form of a hypothetical and there must be some factual basis in the record for the assumption of the potential red flag. Professor Black, and every other expert called to testify on the same or similar issues, should explain his reasons for concluding that an assumed fact is, or is not, a red flag and his reasons for concluding what the response should be. His testimony must be confined to those subjects for which he has knowledge of relevant industry customs, practices, and standards.

### B. Professor Coffee

#### 1. Qualifications

MetLife and Lloyds have designated Professor John C. Coffee, Jr. an expert to testify on the standard of care and the due diligence and disclosure responsibilities of a placement agent. He also has been designated as an expert on causation and damages. Professor Coffee has been a Professor

---

[1] To provide a few examples: Professor Black asserts that Credit Suisse had actual knowledge of various aspects of the National Century fraud, Black Report at 9, 14, 32, 49, 64-66, 76, 96, 114; he speculates about whether Credit Suisse read the offering materials it sent investors, id. at 24; he opines on Credit Suisse's intent and state of mind, id. at 75, 117, 119; and he offers legal conclusions, id. at 106 (Credit Suisse statement was "intentionally misleading").

of Law at Columbia Law School since 1980 and serves as the Director of the Center on Corporate Governance at Columbia University.  Prior to 1980, he was a professor at Georgetown University Law School.  Professor Coffee has been a visiting professor at prestigious law schools across the United States, including Harvard, Michigan, Stanford, and Virginia.  He is a graduate of Yale Law School, and practiced law at Cravath, Swaine and Moore for six years.

Professor Coffee has authored dozens of books and law review articles on topics relating to corporate governance, securities law, and finance.  He has served on advisory committees to the SEC, New York Stock Exchange, Nasdaq, National Association of Securities Dealers, and Securities Regulation Institute.  Professor Coffee has testified before United States congressional committees on eight occasions and has served as an expert in numerous securities lawsuits.

Credit Suisse challenges Professor Coffee's qualifications on the same grounds that it challenged Professor Black's – that he has no experience as an investment banker in Rule 144A placements of non-mortgage, asset-backed securities.  For reasons already discussed, this argument is not persuasive.  See Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir. 1996) (holding that it is an abuse of discretion for the trial court to insist "on a certain kind of degree or background" or require an expert "to be the best qualified" or have "the specialization that the court considers most appropriate").  Moreover, plaintiffs have demonstrated Professor Coffee's exceptional knowledge of securitizations and due diligence standards.  Indeed his testimony before Congress has included testimony about asset-backed securitizations and due diligence standards.

      **2.**     **Reliability**

Credit Suisse repeats the argument that an academic's opinion on due diligence standards is not reliable unless the proffered expert conducts a survey of investment banking professionals in asset-backed securities transactions and reviews all of the relevant professional literature.  This argument is misplaced and the court finds that Professor Coffee's opinions are underpinned by the same analytical rigor characteristic of Professor Black's proffered opinion.  And, as plaintiffs rightly note, Credit Suisse's position approaches the brink of letting industry insiders set their own standards.  See Stagl v. Delta Air Lines, 117 F.3d 76, 82 (2d Cir. 1997) (error for district court to exclude qualified experts by requiring such a "degree of specificity" that it "came close to letting that industry indirectly set its own standards").

### 3. Relevance and Helpfulness

The court will exclude Professor Coffee's report from trial for the same reasons it is excluding Professor Black's report – that it is hearsay and contains inadmissible statements.[2] The parties further debate whether Professor Coffee's use of words like "material" and "reckless" amounts to improper legal conclusions. Upon reviewing Professor Coffee's report, the court finds that his proffered use of terms like "material" and "reckless" does amount to inadmissible legal conclusions. See, e.g., Coffee Report at 59 (describing the "obvious" "materiality of this omission that NCFE was advancing fund to PhyAmerica"), at 60 (opining that information about "future receivables in the NPF portfolios would have been a material fact to reasonable investors"), at 85 (stating that Credit Suisse was "recklessly indifferent to the facts that the indentures were being violated and that investors' funds were being misused"). At trial, Professor Coffee must recast his testimony by using terminology that does not express legal conclusions.

### 4. Damages and the Rebuttal Report

The court notes that Professor Coffee's initial report contained no opinion on damages or the proper way to calculate them. See Coffee Report at 83 ("[T]his report will not address the topic of damages."). His only opinion on the issue of damages came in the form of a rebuttal report to the report of Credit Suisse's damages expert, Allan Kleidon. Professor Coffee's rebuttal report critiques Kleidon's methods for calculating damages.

Credit Suisse challenges Professor Coffee's qualifications to testify about damages. Credit Suisse argues that Professor Coffee is not an economist or accountant and that his rebuttal report is largely devoted to legal argument that Kleidon's methods are contrary to applicable law.

The court finds itself unable to conclude at this time that Professor Coffee is qualified to opine on damages. Plaintiffs have pointed to only two factors in support: Professor Coffee was general counsel for the American Economic Association from 1992 to 1998 and he has "expertise on what the legal rules" governing damages are. Neither factor establishes that Professor Coffee has special knowledge or training in determining damages. At most, they show that he provided legal services to an economic association and that he is familiar with the law applicable to damages.

As Credit Suisse observes, Professor Coffee's rebuttal report consists largely of legal arguments. His arguments are later reflected in plaintiffs' motion to exclude the testimony and

---

[2] The report contains: assertions that Credit Suisse had actual knowledge of various aspects of the National Century fraud, Coffee Report at 22, 34, 48, 56, 65; speculation, id. at 33, 53; opinions on Credit Suisse's intent and state of mind, id. at 24, 38, 52; and legal conclusions, id. at 2, 53, 69 (Credit Suisse made misrepresentations to investors).

report of Allan Kleidon. If plaintiffs do in fact intend to present Professor Coffee as an expert rebuttal witness at trial on the issue of damages, Credit Suisse may move for the court to conduct *voir dire* of Professor Coffee outside the presence of the jury.

### C.     Myron Glucksman

Credit Suisse has designated Myron Glucksman as an expert to testify on securitizations and on industry custom and practice with respect to investment banks in asset-backed securities transactions. MetLife and Lloyds have moved to exclude Glucksman's testimony and report.

Plaintiffs do not challenge Glucksman's qualifications. He is the principal of Myron Glucksman Consulting in New York. He provides advice to banks, law firms, and companies on asset-backed securities and other structured finance issues. Before starting his consulting firm in 2003, he worked in managerial and finance positions for 30 years at Citigroup Corporate and Investment Bank and its affiliated entities. From 1987 to 2003, Glucksman was a Managing Director of Citigroup's Fixed Income/Global Securitized Markets division. He earned a Master of Business Administration in Finance from New York University and a Juris Doctorate from Fordham School of Law. Glucksman has been a guest lecturer on securitizations at Yale Law School, Columbia Law School, and the M.I.T. Sloan School of Management, and he has testified before the U.S. Senate Subcommittee on Securities.

#### 1.      Reliability

Plaintiffs' primary objection to the proffered testimony of Glucksman is that his opinion is based entirely on an unsupported factual assumption that Credit Suisse had no knowledge of the National Century fraud. Plaintiffs argue that an opinion which wholly ignores the factual record is lacking in analytical rigor and cannot be reliable.

With the exception of Glucksman's proffered opinion about Credit Suisse's knowledge, see Glucksman Report at 7-11, the court finds that Glucksman's proffered testimony has a basis in the factual record and is reliable. As did Professors Black and Coffee, Glucksman thoroughly reviewed the record relating to the information which was allegedly available to Credit Suisse, examined what that information would have told a reasonable placement agent, and evaluated how a reasonable actor should have responded in light of industry practice. Glucksman carefully explained the factually support for his analysis and directly addressed the evidence that plaintiffs have pointed to as the most compelling evidence of Credit Suisse's reckless disregard. See Zyprexa Prods., 489 F.Supp.2d at 284-85 (sound methodology often characterized by the expert's effort to account for opposing views).

### 2.  Relevance and Helpfulness

The plaintiffs' objection to the opinion in Glucksman's report that Credit Suisse lacked actual knowledge of the fraud is, however, well-taken. Glucksman will be permitted to testify as to why a reasonable placement agent may not have known of the fraud, but his report contains an opinion (styled as an "assumption") that Credit Suisse did not have knowledge of the fraud, accompanied by what amounts to legal arguments in support of that conclusion. See Glucksman Report at 7-11 (arguing, among other things, that Credit Suisse did not have a motive to commit fraud and that there were no SEC or criminal actions against Credit Suisse). His report also makes an inadmissible suggestion that plaintiffs had an improper motive in bringing this action – he states that plaintiffs should have "absorb[ed] the losses incurred in connection with their decision to purchase the Notes" instead of "seek[ing] to shift the risk of their investments to Credit Suisse" by bringing suit. Id. at 3-4. For these reasons, and also because the report is hearsay, the report will be excluded.[3]

Plaintiffs raise two additional concerns about the relevance of Glucksman's proffered testimony. First they argue that the distinction Glucksman makes between public and private securities offerings is irrelevant because the same antifraud legal standards apply to both. The court, however, agrees with Credit Suisse that Glucksman's testimony about industry practice in private securities offerings is relevant. The jury will be required to make context-dependent determinations about what Credit Suisse should have known and disclosed to plaintiffs and about the reasonableness of plaintiffs' alleged reliance upon Credit Suisse's representations. Glucksman's testimony about industry standards in private offerings, and comparing those standards to industry practices in public offerings, could assist the trier of fact. To the extent plaintiffs believe the distinction is unwarranted, they may pursue that position during cross-examination.

Plaintiffs also object to Glucksman's proffered opinion that industry standards were less stringent during the pertinent time frame (1995 to 2002) than they are now because of the adoption of a securities regulation in 2005. See 17 C.F.R. § 229.1100 (disclosure requirements for asset-backed securities). The court agrees that testimony about the 2005 securities regulation is not

---

[3] Among other things, Glucksman's report also improperly contains: legal conclusions that the issuer, and not Credit Suisse, was the party responsible for the representations in offering materials, Glucksman Report at 41, 52-54, 80; opinion and speculation about what investors knew or "seemed to understand," id. at 67-68, 156, 160; assertions that certain evidence does not, or is not likely to exist, id. at 144-48; and opinions about fact witness credibility, id. at 183, 187, 201-02.

13

relevant and could confuse the jury. Glucksman will not be permitted to opine about the regulation or how it changed industry practice.[4]

### D.   Allan Kleidon

Credit Suisse has designated Allan Kleidon as its damages expert. MetLife and Lloyds have moved to exclude his testimony and report, but they do not challenge his qualifications. Kleidon is a Senior Vice President of Cornerstone Research, an economic and financial consulting firm in Menlo Park, California. He has been a visiting professor of finance and lecturer in finance at several academic institutions, including Stanford Law School, Stanford Graduate School of Business, the University of California at Berkley, and the University of Chicago. Kleidon is an Honorary Professor in the School of Business at the University of Queensland, Australia. He earned several bachelor degrees from the University of Queensland, as well as an M.B.A. and Ph.D. in economics and finance from the University of Chicago. Kleidon has written numerous publications on economic and financial topics, and he has served as an associate editor for the Journal of Finance and the Journal of Financial Economics.

### 1.   Reliability

#### a.   Kleidon's Incremental Knowledge Approach

The parties agree that the appropriate measure of damages is the "out-of-pocket" measure, by which "'a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got.'" Acticon AG v. China North East Petroleum Holdings Ltd., 692 F.3d 34, 38 (2d Cir. 2012) (quoting Levine v. Seilon, 439 F.2d 328, 334 (2d Cir. 1971)); see also Lama Holding Co. v. Smith Barney Inc., 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (N.Y. 1996) (adopting out-of-pocket rule as the correct measure of damages in a fraudulent misrepresentation action). In other words, "damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions." In re Executive Telecard, Ltd. Secs. Litig., 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997). The true value of what the plaintiffs received is measured as of the date of purchase. Acticon, 692 F.3d at 38.

Plaintiffs' challenge to Kleidon's proffered testimony is directed at how he, despite reciting the correct law, has in practice calculated out-of-pocket damages. Kleidon proposes an "incremental knowledge" approach, whereby the "correct way to calculate out-of-pocket damages is to specify

---

[4] Testimony about change in practice or standards during the 1995 to 2002 time frame would be relevant, but the court is not aware that Glucksman has opined on any such change.

what investors knew at each purchase date, what additional information (if any) Credit Suisse knew as of that date, and then calculate the resulting change in the value of the note *given just that additional information*." Kleidon Report at ¶ 94 (emphasis in original). Credit Suisse describes the approach as follows:

> [D]amages can only be properly determined by assigning a monetary value to the differential between the information available to Credit Suisse and Plaintiffs regarding the alleged NCFE fraud at the time of purchase.

Credit Suisse Opp'n Br. at 9.

Plaintiffs argue that Kleidon's approach is novel and unreliable. The court agrees in part. Kleidon's incremental knowledge approach makes a two-part inquiry: what the defendant knew at the time of purchase and what the plaintiffs knew at the time of purchase. As to the first part of the inquiry, the court finds nothing unreliable or otherwise improper about assigning a value to information that the factfinder determines the defendant knowingly, or with reckless disregard, misrepresented or omitted. Plaintiffs concede that damages are measured by the difference between the purchase price and "the fair market value less the misrepresentations." Pls.' Reply Br. at 5 n.6 (citing Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)). Thus, in arriving at a determination of the true value of the security, the factfinder must examine: what the defendant knew or should have known; what portion of that information the defendant misrepresented to plaintiffs or omitted, where it had a duty to disclose; and what the value of the security would have been on the purchase date had the misrepresentations or omissions been made known.[5] See Executive Telecard, 979 F. Supp. at 1025; Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F.Supp.2d 428, 457 (S.D.N.Y. 2003) (holding that under New York law plaintiffs' damages are "confined to recovering the actual pecuniary loss sustained as a result of the defendants' fraudulent misrepresentations.").

Plaintiffs stress that the inquiry into the securities' true value is objective. The court does not disagree, but in making this objective determination the jury must necessarily focus on what information was knowingly, or with reckless disregard, misrepresented or omitted. In the context of a fraudulent misrepresentation claim, the jury's findings as to what the defendant knowingly misrepresented will guide its determination of "the price at which the stock would have sold absent the alleged misrepresentations or omissions." Executive Telecard, 979 F. Supp. at 1025; accord

---

[5] It should be noted that plaintiffs do not allege that Credit Suisse's misrepresentations merely inflated the price of the NPF notes. Rather, plaintiffs allege that the notes would have been worthless had the misrepresentations and omissions been made known on the day of purchase.

Spencer Trask, 383 F.Supp.2d at 457.  Under the court's trial structure plan in this case, the jury will be required in Stage I of the trial to make specific findings as to Credit Suisse's knowledge of certain aspects of the National Century fraud and as to whether Credit Suisse made any misrepresentations to plaintiffs about those aspects of the fraud.  If the jury finds in plaintiffs' favor in Stage I, the jury's findings will sharpen the focus of the parties' presentation in the next stage on the issue of damages.  Expert testimony will be helpful to the jury in determining what the value of the notes would have been had the misrepresentations or omissions been made known.

Turning to the second part of Kleidon's approach – what the plaintiffs knew at the time of purchase – the court finds that Kleidon's opinion is not reliable.  Kleidon acknowledges that damages are measured by the difference between the purchase price and the note's true value, but he seeks to discount the purchase price by assigning value to what plaintiffs knew when they made their purchases.  The inquiry into what plaintiffs knew is one properly made in the context of reasonable reliance.  Further, negative information known to the buyer would ordinarily be reflected in the purchase price.  One could argue, as Kleidon does in his report, that NPF notes were not traded in an efficient market and thus the purchase price did not accurately reflect information known to buyers and sellers.  Even so, the buyer's decision to allegedly overpay for the notes, in light of the information known by or available to the buyer, goes to the issue of reasonable reliance on the seller's alleged misrepresentations.  That is, when the jury determines the issue of reasonable reliance, it may consider whether the buyer possessed negative information about the investment and, if so, whether the buyer reasonably chose to rely on an alleged misrepresentation which counteracted the negative information when the buyer decided to pay a non-negotiable purchase price for the notes.

The court finds that Kleidon's approach would essentially change the methodology for measuring out-of-pocket damages by permitting a hindsight revision of the parties' agreed-upon purchase price.  Credit Suisse has cited no support for such an approach.  Accordingly, Kleidon will not be permitted to opine on how plaintiffs' knowledge should affect the damages calculation.

### b. Kleidon's Distinctions Among Note Types

For similar reasons the court finds to be unreliable Kleidon's attempt to discount any recovery received by plaintiffs who purchased what Kleidon calls "riskier" securities.  Those riskier securities are Class B notes and the NPF XII variable funding note ("VFN").  The bulk of plaintiffs' purchases were of Class A notes, but some plaintiffs did purchase Class B notes and Lloyds invested in the VFN.  Kleidon states that plaintiffs who purchased Class B notes knew they were

subordinated to Class A notes, such that Class A investors were paid first.  He further states that Lloyds knew that investing in the VFN carried risk because it required an irrevocable commitment of one year.

Again, one would normally expect known risk to be factored into the purchase price.  But even if it was not, the court finds that Credit Suisse has advanced no grounds for Kleidon's proposition that the purchase price component of the damages calculation should be adjusted downward for risk.

Accordingly, Kleidon will not be permitted to opine on how plaintiffs' knowledge of risk, or their diminished expectations of payment, should affect the damages calculation.

### c.     Kleidon's Setoff Calculations

At the request of counsel for Credit Suisse, Kleidon made several adjustments to his calculations of out-of-pocket damages.  These adjustments were based on different scenarios counsel asked Kleidon to consider.  Kleidon Report at ¶¶ 140-51.  For instance, Kleidon removed losses from notes that plaintiffs purchased from a seller other than Credit Suisse.  Kleidon also made calculations in which he removed the time value of money from the damages calculation of plaintiffs' damages expert.[6]

Plaintiffs object on the grounds that these scenarios are hypotheticals without any basis in fact.  See Fed. R. Evid. 702(b); McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.").  The court finds that there is factual basis for Kleidon's adjustments.  The court's summary judgment ruling makes plain that there were plaintiffs who made note purchases from someone other than Credit Suisse.  See In re Nat'l Century Fin. Enters., Inc., 846 F.Supp.2d 828, 902 (S.D. Ohio 2012).  At trial, the parties' damages experts must remove from their calculations the purchases for which the court has held as a matter of law that Credit Suisse is not liable.

Kleidon and other damages experts shall not testify before the jury about the time value of money without prior court approval.  The issue of the time value of money would seem to be relevant only to the matter of prejudgment interest.  See Kassis v. Teachers' Ins. and Annuity Ass'n, 786 N.Y.S.2d 473, 474 (N.Y. App. Div. 2004) ("The purpose of prejudgment interest is to

---

[6] Kleidon also made setoff calculations based on plaintiffs' investment gains from other NPF note purchases that are not the subject of this litigation.  The propriety of this setoff calculation is at issue in a separate motion in limine and will be addressed by the court in connection with that separate motion.

compensate parties for the loss of the use of money they were entitled to receive, taking into account the 'time value' of money."); see also Taaffe v. Life Ins. Co. of N. Am., 769 F.Supp.2d 530, 538 (S.D.N.Y. 2011); In re Crazy Eddie Secs. Litig., 948 F.Supp. 1154, 1166 (E.D.N.Y. 1996). Under New York law, prejudgment interest is an issue for the court, and not the jury, to determine. See N.Y. C.P.L.R. §§ 5001, 5002; Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d Cir. 1994); Healing Power, Inc. v. Ace Continental Exports, Ltd., No. 07-cv-4175, 2008 WL 4693246, at *9 (E.D.N.Y. Oct. 17, 2008).

### 2. Relevance and Helpfulness

Plaintiffs rightly object to the repeated opinion in Kleidon's report that Credit Suisse could not have known of the National Century fraud. Kleidon often states that such a proposition is "extreme" and "economically implausible." Kleidon Report at ¶¶ 52, 65, 94, 112-28. As an economist, Kleidon may identify facts (assuming they have a basis in the record) regarding conduct, such as substantial financial exposure to the securities issuer, that arguably would be economically irrational if a reasonable placement agent knew of fraud by the issuer. He may likewise identify economic behavior that arguably would be inconsistent with an allegation that a placement agent knew of fraud. However, Kleidon may not opine that a finding of knowledge is impossible or implausible. Because Kleidon's report is hearsay and because it improperly opines that the allegation of Credit Suisse's knowledge is implausible and also contains inadmissible assertions about the actual knowledge of MetLife and Lloyds, id. at ¶¶ 77, 79, 118, the report will be excluded. Kleidon may not express such opinions at trial.

### III. Conclusion

For the reasons set forth above, the court grants in part and denies in part the following motions in limine: Credit Suisse's motion to in limine to exclude the testimony and report of Professor Black (doc. 104); Credit Suisse's motion to in limine to exclude the testimony and report of Professor Coffee (doc. 105); MetLife and Lloyds's motion in limine to exclude the testimony and report of Myron Glucksman (filed under seal on Dec. 21, 2012); and MetLife and Lloyds's motion in limine to exclude the testimony and report of Allan Kleidon (filed under seal on Dec. 21, 2012).

These motions are granted with respect to exclusion of the expert reports from trial. The motions are denied with respect to exclusion of the expert's testimony from trial, subject to the limitations stated in this order.

IT IS SO ORDERED.

                                                                  s/ James L. Graham  
                                                                  JAMES L. GRAHAM  
                                                                  United States District Judge

DATE: March 12, 2013